IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 11, 2013 Session

IN THE MATTER OF FAITH A. F.[1]

**Appeal from the Juvenile Court for Wilson County**
**No. 11363     Charles B. Tatum, Judge**

_____

**No. M2011-02563-COA-R3-JV - Filed July 26, 2013**

_____

Father in child custody and support proceeding appeals the trial court's findings: (1) that he was in criminal contempt of court; (2) that he was in civil contempt of court and setting the amount necessary to purge himself of contempt; (3) in suspending his parenting time; (4) modifying his child support obligation; and (5) ordering him to pay Mother's attorney fees. We have determined that the finding of criminal contempt, the order modifying his child support obligation, and the order that Father pay Mother's attorney fees should be vacated and the case remanded for further proceedings in connection therewith. In all other respects we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Vacated in Part; Case Remanded.**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., M. S., and ANDY D. BENNETT, J., joined.

Thomas H. Miller, Nashville, Tennessee, for the Appellant, Blaine A. F.

Debra L. Dishmon, Lebanon, Tennessee, for the Appellee, Amy F. P.

Elizabeth Lee Luongo Youmans, Lebanon, Tennessee, as guardian ad litem.

**OPINION**

This case comes before us for the second time. In the earlier appeal, Blaine F., the father of Faith A. F. ("Father"), who had been her primary residential parent, appealed the

---

[1] This Court has a policy of protecting the identity of children in dependent and neglect cases by initializing the last names of the parties.

denial of his petition to relocate as well as the grant of the petition of Faith's mother, Amy P. ("Mother"), to be named Faith's primary residential parent and to change custody. The trial court orders at issue in that case were entered on June 15, and October 1, 2009; our opinion and judgment affirming the trial court's action was entered February 17, 2011. *In Re Faith F.*, No. M2009-02473-COA-R3-JV, 2011 WL 579158 (Tenn. Ct. App. February 17, 2011).

In this appeal, Father appeals orders of the Juvenile Court of Wilson County holding him in criminal contempt for violation of a court order and civil contempt for failing to pay child support. The orders arose from a petition filed by Mother on November 4, 2009 to have Faith declared dependent and neglected, to have Father's parenting time supervised, and for Father to be held in "wilful civil and/or criminal contempt of Court" for failure to pay child support.[2] On November 12 Father filed a motion to dismiss the contempt portion of the petition on the grounds that the orders he was alleged to have violated were under appeal and, consequently, the trial court had no jurisdiction to consider the petition.

On November 24, 2009, the court entered an order on Mother's November 4 petition and on Father's motion to dismiss the contempt portion of the petition. The order recites that, at a hearing on November 12, Mother announced that she elected to proceed only on the civil contempt; the court allowed the case to proceed on that basis and set the trial for February 11, 2010. Mother filed an amended petition on December 17, largely setting forth matters which had occurred since the filing of the previous petition and again seeking to have Faith declared dependent and neglected, to have Father held in contempt, and to have Father's child support obligation recalculated in light of his relocation to California. The record shows that, for various reasons not germane to this appeal, a hearing was not held on February 11, 2010.

---

[2] A Notice of Constitutional Rights was filed with the court on November 5. With respect to the contempt, the Petition alleged that Father had been ordered to pay support of $494 per month beginning August 5, 2009, and had failed to do so; that Father had failed to pay 66% of Faith's co-pays and other medical expenses; and that Father had failed to pay attorney fees to Mother's counsel as previously ordered. The petition also alleged that during the weekend prior to the filing of the petition, Father had allowed his wife to administer flu and H1N1 vaccinations to Faith without Mother's knowledge or concurrence; Mother requested that a guardian ad litem be appointed for Faith. An order appointing a guardian ad litem was entered on November 13.

A hearing was held on various motions on November 23, 2011[3]; there was no testimony or other proof offered at the hearing, rather the court heard from the guardian ad litem and counsel for the parties. In the course of the hearing the court made the following ruling:

> And as I've said before, in language that's included in an order, [Father] is a manipulator; and he is honest when it suits him, and manipulative and untruthful when it doesn't.
>
> I'm going to find that he's in civil contempt for each month that he has failed to pay child support, I'm going to find that he's had the ability to pay, or to obtain funds, but has elected to, in most of those months, make no effort at all, and has only made token support recently towards the support of this child.
>
> I'm also going to find that he's in contempt for violating the most recent directive for taking the child somewhere other than a public place, when it was specified she was taken in a public place, and was not to discuss any sort of testimony or the status of the court case with this child. Just another glaring example that [Father] doesn't care, and doesn't care about anybody except himself. And he's going to have a good bit of time to think about that, because I'm going to give him – my math on her would be 28 months, I believe, of child support that he has not been paid, and I'm going to find that he's in contempt for five days for each one of those 28 months. And that would be . . . 140 days.
>
> He can cure those issues by making payment of the $24,189. I'm going to give him credit for the lower amount of child support, since that he is - -I've suspended the visitation in the past, he's been in California, and - - although a large part of that was due to [Father's] lack of cooperation and his delay in providing discovery. Again by his testimony and contention, it was someone else's fault it was delayed, but I don't believe that. So 140 days.
>
> * * *
>
> However, I am going to make - - since this last order was so egregiously violated, I am going to make it a minimum of ten days to serve for violating that - - interrogation of this child, and taking her somewhere other than a public place, so he's going to serve 10 days regardless; no amount of money is going to be able to get him out.

---

[3] The record does not contain an order entered immediately following the hearing, however, an order entered on February 22, 2012 states that the November 23 hearing was for the parties to receive the court's ruling on Mother's petition and on a motion the guardian ad litem had filed to suspend Father's visitation.

At the conclusion of the hearing Father was taken into custody. He subsequently filed a Tenn. R. App. P. 10 Application for Extraordinary Appeal, appealing the criminal contempt ruling at the November 23 hearing and his resulting incarceration; on December 2 this court entered an order staying Father's sentence pending the filing of a Tenn. R. App. P. 3 notice of appeal and the resolution of that appeal and releasing him from incarceration. Father filed a Notice of Appeal on December 7.

On February 22, 2012, the trial court entered an order, *inter alia*, memorializing the oral ruling on November 23, 2011. The order recited that it covered hearings on Mother's motion held August 3, 5, and 10, 2011 and hearings on September 19 and October 7 on Father's motion for parenting time, as well as the matters heard on November 23. After making extensive findings, the court: (1) denied Mother's petition to declare Faith dependent and neglected; (2) held Father in criminal contempt for violations of the November 7, 2011 court order as well as for giving false testimony under oath and sentenced him to ten days in jail; (3) held Father in civil contempt for failure to pay child support, sentencing him to a total of 140 days in jail, and setting the sum of $24,128.98 as the amount necessary for Father to purge himself of contempt; (4) suspended Father's parenting time until Faith's counselor recommended that she reconcile with Father; (5) modified Father's child support obligation to $803.00 per month; and (6) ordered Father to pay Mother's attorneys' fees totaling $18,106.23.

On May 10, 2012, Mother filed a petition to modify the February 22 order, primarily to address matters related to Father's bankruptcy filings in California and a June 15 Order issued by the bankruptcy court.[4] On August 31 the court entered an order modifying the February 22 Order to comply with the order of the bankruptcy court.

---

[4] The record shows that Father filed bankruptcy in California on September 27, 2011. On June 15, 2012, the bankruptcy court entered an order stating in part pertinent to this appeal:

> 2. [Father and his wife] originally sought damages and sanctions against [Mother and her counsel] for the order of the Juvenile Court of Wilson County, Tennessee . . . which held [Father] in criminal contempt and incarcerated him for ten (10) days in the Wilson County Jail. To the extent [Father and his wife] still pursue this relief, it is denied because the Trial Court's action is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(1).
> 3. With respect to the Trial Court's order holding [Father] in civil contempt, requiring him to pay $24,128.98 to purge the contempt, the Trial Court's order is void to the extent it could be interpreted to require payment from the bankruptcy estate of [Father and his wife]. [Mother and her counsel] have taken affirmative steps to correct the order and no relief is necessary should the order be modified in this respect with the Trial Court or with any appellate court of competent jurisdiction.

In his brief on appeal, Father raises the following issues:

1. Whether the trial court erred in finding Father in criminal contempt of court.
2. Whether the trial court erred in finding Father in civil contempt of court.
3. Whether the trial court erred in setting the purge amount.
4. Whether the trial court erred in suspending Father's parenting time.
5. Whether the trial court erred in its calculation of Father's child support obligation.
6. Whether the trial court erred in its calculations of Mother's attorney fees.

## DISCUSSION

## I. CRIMINAL CONTEMPT

Father was held in criminal contempt for violating the November 7, 2011 order of the court, which the court entered following hearings on September 19 and October 7, and for presenting perjured testimony.[5] He argues that the holding that he was in criminal contempt should be reversed because he did not receive notice and opportunity for hearing in accordance with Tenn. R. Crim. P. 42(b).

---

[5] The portion of the November 7, 2011 order pertinent to this issue states:

1. When Father is in town, he shall, upon seven (7) days notice to Mother, have two (2) hours of parenting time with the minor child to take the minor child to dinner at a restaurant. Alternatively, with seven (7) days notice to Mother, if Father chooses to take the minor child to a movie he may have three (3) hours of parenting time with the minor child. Father's parenting time shall be exercised at all times in a public location.
    * * *
4. The parents shall be restrained from questioning the minor child as to where the minor child wants to live or with whom the minor child wishes to live. The parents shall be further restrained from discussing current or prior court proceedings with the minor child or in the minor child's presence, and from permitting family members or associates to discuss current or prior court proceedings with the minor child or in the minor child's presence.
5. The parties shall appear before this court on November 23, 2011 at 4:00 p.m. for a ruling on the contempt issues.

In the February 22, 2012 order holding Father in criminal contempt, the court stated:

A hearing was held on October 7, 2011 upon Father's *Motion for Holiday Parenting Time.* Father, his wife, and the paternal grandparents were present in court when this Court ruled. As reflected in this Court's Order entered November 7, 2011, this Court found it would be detrimental and not in the minor child's best interest for Father to have more than minimal contact with the child, and ordered that Father have limited parenting time under supervision by the stepmother and paternal grandfather with Father's parenting time to occur in a public location at all times. Further, in said order, this Court restrained both parents from questioning the minor child as to where the child wanted to live or with whom the minor child wanted to live, discussing current or prior court proceedings with the minor child or in the minor child's presence. This Court specifically advised Father during the October 7th hearing that there was a very real possibility that Father would be incarcerated for contempt issues. The parties were directed to return to court on November 23, 2011 for this Court's ruling.

In a blatant and glaring example of Father's disregard for this Court's orders, during Father's initial visit following this Court's directives issued during the October 7, 2011 hearing, Father, on October 8, 2011, accompanied by the stepmother and paternal grandparents, violated this Court's directives by taking the child somewhere other than a public place. Further, Father, the stepmother, and the paternal grandparents blatantly violated this Court's orders during said parenting time by interrogating the minor child regarding her prior testimony, by discussing Father's intention to surrender his parental rights, and by asking the minor child if she wanted to be adopted by her stepfather. Mother alleged that Father, his wife, and the paternal grandparents took the minor child to the paternal grandparents' residence, that Father forcefully carried the minor child upstairs, that the paternal grandmother had to pry the child's fingers from the stair rail and in the process scratched the minor child.

When given the opportunity to dispute the substance of Mother's allegations, Father's attorney responded, "I know the substance of that is, I think, pretty accurate." Because this Court's October 7, 2011 Order was so egregiously violated, this Court finds Father to be in willful criminal contempt for his blatant disregard of this Court's orders, and further finds that Father shall, summarily, be punished accordingly.

* * *

-6-

This Court finds that Father presented perjured testimony to this Court specifically regarding Father's income, Father's Federal Income Tax returns, and Father's bank records, all of which were crucial in determining Father's ability to pay his child support related financial obligations, thereby constituting an obstruction of justice. Father blatantly stated twice to this Court "if I lied, I lied" in regards to his income and two (2) sets of Federal Income Tax returns presented to the Court as evidence by Father.

This Court finds that Father made numerous false representations to this Court regarding Father's bank account information. Specifically, Father, in sworn discovery responses and by and through his attorney in response to Motions to Compel, represented to this Court on numerous occasions that Father did not have, and had not had, a bank account, nor had Father had access to a bank account. Father subsequently filed bank account statements with this Court for three (3) bank accounts. This Court finds that Father's actions caused numerous hearings to be held, and numerous delays in scheduling a final hearing thereby constituting an interference with processes of this Court. This Court therefore finds Father to be in willful criminal contempt for his numerous instances of perjured testimony and that Father shall, summarily, be punished accordingly.

While we acknowledge the trial court's frustration with Father—a frustration fully justified in our review of the record—we are constrained to vacate the holding that Father was in criminal contempt and to remand the case for further proceedings in compliance with the rule.

Tenn. R. Crim. P. 42 states:

**(a) Summary Disposition.** A judge may summarily punish a person who commits criminal contempt in the judge's presence if the judge certifies that he or she saw or heard the conduct constituting the contempt. The contempt order shall recite the facts, be signed by the judge, and entered in the record.

**(b) Disposition on Notice and Hearing.** A criminal contempt shall be prosecuted on notice, except as provided in subdivision (a) of this rule.

(1) *Content of Notice.* The criminal contempt notice shall:
    (A) state the time and place of the hearing;
    (B) allow the defendant a reasonable time to prepare a defense; and

(C) state the essential facts constituting the criminal contempt charged and describe it as such.

(2) *Form of Notice.* The judge shall give the notice orally in open court in the presence of the defendant or, on application of the district attorney general or of an attorney appointed by the court for that purpose, by a show cause or arrest order.

(3) *Release on Bail.* The criminal contempt defendant is entitled to admission to bail as provided in these rules.

(4) *Disqualification of Judge.* When the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the hearing, except with the defendant's consent.

(5) *Punishment Order.* If the court finds the defendant guilty of contempt, the court shall enter an order setting the punishment.

As is clear from the rule, unless the alleged contemptuous act was committed in the presence of the court, a proceeding to hold a person in criminal contempt of court must comply with Tenn. R. Crim. P. 42(b). *Bailey v. Crum*, 183 S.W.3d 383, 388 (Tenn. Ct. App. 2005) (citing *State v. Maddux*, 571 S.W.2d 819, 821 (Tenn. 1978); *Jones v. Jones*, 01A01-9607-CV-00346, 1997 WL 80029, at *8 (Tenn. Ct. App. February 26, 1997)). The notice required by the rule must "specifically charge a party with criminal contempt and must succinctly state the facts giving rise to the charge." *Bailey*, 183 S.W.3d at 388.

The record does not show that Father was given the notice required by Tenn. R. Crim. P. 42(b). The trial court's statement from the bench that a violation of its order would possibly lead to a criminal contempt holding and a period of time spent in jail did not satisfy the procedural notice requirements of Tenn. R. Crim. P. 42(b). Accordingly, we vacate the trial court's holding of criminal contempt and remand the case for further proceedings.[6]

---

[6] We also note that the court's factual findings leading to the criminal contempt holding were based largely on statements of counsel and the guardian ad litem. Inasmuch as the defendant in a criminal contempt proceeding is entitled to all the constitutional protections afforded to a defendant in a criminal trial, *see Storey v. Storey*, 835 S.W.2d 593, 599 (Tenn. Ct. App. 1992), any finding of criminal contempt should be based on the sworn testimony of witnesses in a hearing at which Father has had the opportunity of cross-examination.

## II. CIVIL CONTEMPT

### A. Effect of Father's Bankruptcy

Father contends that the court erred in finding him in civil contempt because the prosecution of the proceeding violated the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362. Under the facts presented here, we do not find any impropriety in the court's handling of this matter.

The effect of the automatic stay in bankruptcy on proceedings to enforce child support obligations was addressed by the court in *Matter of Rogers*:

> Under [Bankruptcy Code provisions 11 U.S.C. § 362(a)(1) & (a)(2)], all proceedings against the debtor and his property are stayed during the pendency of the bankruptcy case. The automatic stay, however, does not allow a debtor to challenge the prepetition conduct of a creditor. Moreover, claims against the debtor that arise postpetition do not come within the scope of § 362(a) since they could not have been brought before the bankruptcy case was commenced. *See In re Petruccelli*, 113 B.R. 5, 6 (Bankr. S.D. Cal. 1990).

> Despite the broad scope of the automatic stay, however, it does not serve to stay all proceedings involving the debtor. *Heflin v. Heflin (In re Heflin)*, 145 B.R. 560, 562 (Bankr. S.D. Ohio 1992); *In re Shuman*, 122 B.R. 317, 318 (Bankr. S.D. Ohio 1990). In fact, § 362(b) of the Bankruptcy Code expressly provides that certain actions are not stayed by the filing of a petition. Among the acts excepted from the automatic stay is "the collection of alimony, maintenance, or support from property that is not property of the estate." 11 U.S.C. § 362(b)(2) (emphasis added). As such, a former spouse's action to collect prepetition support arrearage is not subject to the automatic stay, so long as property of the estate would not be used to satisfy the claim.

> While § 362(b)(2) provides for an exception to the automatic stay in certain situations, a logical inference from this provision is that the automatic stay does apply to the collection of alimony, maintenance, or support from property that is included in the property of the estate.

*Matter of Rogers*, 164 B.R. 382, 387 (Bankr. N.D. Ga. 1994).

The record before us shows that hearings on Mother's motions for contempt were held on August 3, 5, and 10, 2011; an exhibit introduced at the August 5 hearing computed the

arrearage in child support payments at $24,189.02 as of August 1, 2011. It is clear that the child support arrearage which served as the basis of the holding that Father was in civil contempt was pre-petition. The court subsequently modified its order in accordance with the bankruptcy court's directive to provide that the order was not to be interpreted to require payment of the arrearage from the bankruptcy estate. Under these circumstances, the court's order calculating the arrearage and holding Father in civil contempt did not violate 11 U.S.C. § 362.[7]

### B. Father's Ability to Pay

Father contends that the civil contempt holding should be vacated because he demonstrated that he did not have the ability to pay; Father does not cite to evidence in the record in support of this contention, rather, he argues:

> [Father] produced thousands of pages of documents in response to Mother's discovery requests. He testified as to his current income and expenses. He had sought Chapter 13 bankruptcy protection. There was no credible evidence to counter Father's proof that he lacked the present ability to pay at the time of the hearing.

A person who has failed to make monetary payments required by a previous court order may be held in civil contempt only if the court concludes, by a preponderance of the evidence, that the person has not made the payments despite having the present ability to do so. *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 474 (Tenn. 2003); *Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000); *Loy v. Loy*, 222 S.W.2d 873, 877–78 (Tenn. Ct. App. 1949). A judgment of contempt "must contain an affirmative finding of defendant's ability to pay." *Loy*, 222 S.W.2d at 878 (citing *Cash v. Quenichett*, 52 Tenn. 737, 741 (Tenn. 1871); *Bradshaw v. Bradshaw*, 133 S.W.2d 617 (Tenn. Ct. App. 1939); *Crowder v. Hayse*, 9 Tenn. App. 55, 62 (Tenn. Ct. App. 1928)). The defendant's "present ability to pay" is established based on the following:

> Failure to comply with a child support order establishes a prima facie case of civil contempt against the payor, as "in the original decree the court has

---

[7] Other hearings were held on September 9 and October 7 on Father's motion for parenting time. The transcript of the October 7 hearing shows that the fact that Father filed bankruptcy on September 27 was addressed in the hearing; indeed, a copy of the bankruptcy petition, in which Father listed a claim arising in the instant proceeding in the amount of $3,946.00 under Schedule E—creditors holding unsecured priority claims— and a claim in the amount of $20,000.00 to Mother under Schedule F—creditors holding unsecured nonpriority claims—was filed in the course of the hearing. No objection or other reservation to proceeding with any aspect of the Juvenile Court proceeding was raised by Father.

necessarily found a present ability to pay." *Chappell v. Chappell*, 261 S.W.2d 824, 831 (Tenn. Ct. App. 1952) (citing *Clark v. Clark*, 278 S.W. 65 (Tenn. 1925); *Gossett v. Gossett*, 241 S.W.2d 934 (Tenn. Ct. App. 1951)). Once a violation of the support order is shown, the defendant bears the burden of proving his inability to make the payment as directed. *Id.* (citations omitted); *see also State ex rel. Moore v. Owens*, No. 89-170-11, 1990 WL 8624, at *3 (Tenn. Ct. App. Feb. 7, 1990). If the defendant establishes his inability to pay, and that such inability is not the result of willful impoverishment, the burden then shifts to the plaintiff to demonstrate the defendant's ability to perform. *Moore*, 1990 WL 8624, at *3; *see also Bradshaw v. Bradshaw*, 133 S.W.2d 617, 619–20 (Tenn. Ct. App. 1939).

*State ex rel. Tucker v. Simmons*, No. W2011-00556-COA-R3-JV, 2011 WL 4552282, at *2 (Tenn. Ct. App. Oct. 4, 2011).

In the order holding Father in contempt, the court stated:

This Court finds that Father, despite having the ability to do so, has willfully failed for the past twenty-eight (28) months to meet his financial obligations as ordered by this Court. Based upon proof presented, Father drives a large late-model pick up truck, resides in a nice home, has sufficient income to travel to places such as Las Vegas and Lake Tahoe, and is able to do things that people who appear to be fairly successful as able to do. Father has elected, in most months, to make only token support towards the support of the minor child, despite having the ability to pay as ordered.

In addition, the court made a specific finding that Father "lacks credibility . . . in that Father is honest when it suits him, and manipulative and untruthful when it doesn't." As noted previously, the court found that Father presented perjured testimony regarding his financial affairs.

Father failed to sustain his burden of showing that he was unable to pay the support. Tax returns and bank records show that Father had income over the period of time at issue in an amount sufficient to satisfy his obligation. We have reviewed his testimony and concur with the trial court that it is evasive and, in many instances, contrary to the documentary evidence. We defer to the court's credibility determination and accord the court's findings of fact a presumption of correctness in accordance with Tenn. R. App. P. 13(d); we have been cited to no evidence that preponderates against the finding that he had the ability to pay.

-11-

## C. The Court's Setting of the Purge Amount

Father next contends that the court erred in setting the purge amount of $24,128.98. He does not take issue with the amount of the arrearage, rather he contends that the court's action is erroneous because "the only property to which Father had access to possibly pay the purge amount would have been wages earned after his bankruptcy filing on September 27, 2011." This is a variation of an argument Father made to the bankruptcy court when he sought to have the trial court's order declared void and to recover damages from Mother and her counsel as a sanction for the prosecution of the contempt petition.

As an initial matter, the trial court did not err in setting the amount required for Father to purge himself of contempt. The amount set was simply a calculation of the arrearage owed by Father, an amount he does not contest and which is supported by the record. It is not the court's role to ascertain whether or how a person who has been held in civil contempt may pay the purge amount; rather, the court's role is to determine the amount that will bring the person into compliance with the court's order. *See Robinson v. Fulliton*, 140 S.W.3d 304, 309 (Tenn. Ct. App. 2003) (citing *Ahern*, 15 S.W.3d at 79). The court determined that Father would be required to pay the entire arrearage to purge himself of contempt and we find no infirmity with this ruling.

Father also contends that "the purge amount should have been set on [his] income for the 57 days from September 27, 2011 until November 23, 2011 less reasonable expenses, since [he] could only use post-petition earnings to purge himself of contempt." This was an argument also made, and rejected, by the bankruptcy court.[8] The purge amount was the amount of the support payments Father missed through August 1, 2011 and had no relation to Father's post-petition financial matters. This contention is without merit.

The court was required to determine that Father had the ability to comply with the order at the time of the hearing as a prerequisite to ordering that he be incarcerated. *See*

---

[8] At the hearing on Father's petition, the bankruptcy court stated:

> The problem with the civil contempt order wasn't the purge amount. The purge amount was a calculation based on twenty-eight months of nonpayment of domestic support obligations, and it was a calculation to achieve a number, which will probably be dischargeable in the bankruptcy once the bankruptcy is done. Nobody's asked me to make that determination, but that purge amount's going to survive and have to be repaid at some point in time. . . .The problem here that I see is not - - the issue is not what the court has fixed as being a purge amount. It's in the issue of whether - - Mr. Freeman had the ability to repay that at that time.

*Ahern*, 15 S.W.3d at 79; *see also* Tenn. Code Ann. § 29-9-104(a).[9] We have examined the record at length and determined that the same facts found by the trial court to support its determination, quoted above in Section II B, that Father had the ability to pay his support as it became due, support a finding that he had the ability to pay the purge amount.[10] Father has not cited any evidence to support his contention that he did not have the ability to pay, while there is abundant evidence in the record of Father's lifestyle and expenses in excess of the income which he contends he made, as well as $25,000 received from his father-in-law which he applied for "bills, attorneys fees."[11]

## III. SUSPENSION OF PARENTING TIME

We turn next to Father's contention that the trial court erred when it suspended his parenting time. The court made the following provision relative to Father's parenting time in the February 22, 2012 order:

> Father's parenting time shall be suspended until the minor child progresses in her therapy such that her counselor recommends reconciliation with Father. Father may contact the therapist to identify himself and discuss his desire to have a relationship with the minor child, but shall not do anything to interfere with the minor child's therapeutic relationship with the counselor.

Father contends that this provision is a "drastic measure" which "infringes upon Father's constitutionally protected parental rights and is unsupported by the evidence."

In its order, the court made the following findings, which Father does not contest:

> This court finds that Father's actions during his parenting time with the minor child as alleged in Mother's *Petition* and throughout the pendency of this action warrant a modification of Father's parenting time. Mother alleged in

---

[9] Tenn. Code Ann. § 29-104(a), governing contempt, states:

(a) If the contempt consists in an omission to perform an act which it is yet in the power of the person to perform, the person may be imprisoned until such person performs it.

[10] We note, as did the bankruptcy court, that Father did not assert an inability to pay the purge amount as a defense to being held in civil contempt at the hearing.

[11] In his bankruptcy proceeding Father sought to recover $16,000 in damages which he contended were expenses incurred in "dealing with the civil contempt order." That father was able to pay such expenses is evidence of his ability to pay the purge amount.

her *Petition* that the minor child was being subjected to episodes of violence during Father's parenting time. [ ], Father's sister, testified that the minor child was present at the paternal grandmother's home during Father's parenting time when Father verbally and physically assaulted [Father's sister], and that an Order of Protection was subsequently entered against Father by agreement in Sumner County Chancery Court.

* * *

This Court finds that an existing problem throughout the pendency of this case has been Father's . . . disregard for the welfare of the minor child. . . . As reflected in this Court's Order entered November 7, 2011, this Court found it would be detrimental and not in the minor child's best interest for Father to have more than minimal contact with the child, and ordered that Father have limited parenting time under supervision by the stepmother and paternal grandfather with Father's parenting time to occur in a public location at all times. Further, in said Order, this Court restrained both parents from questioning the minor child as to where the child wanted to live or with whom the minor child wanted to live, discussing current or prior court proceedings with the minor child or in the child's presence, and from permitting family members or associates discussing current or prior court proceedings with the minor child or in the child's presence. . . .

In a blatant and glaring example of Father's disregard for this Court's orders, during Father's initial visit following this Court's directives issued during the October 7, 2011 hearing, Father, on October 8, 2011, accompanied by the stepmother and paternal grandparents, violated this Court's directives by taking the child somewhere other than a public place. Further, Father, the stepmother, and the paternal grandparents blatantly violated this Court's orders during said parenting time by interrogating the minor child regarding her prior testimony, by discussing Father's intention to surrender his parental rights, and by asking the minor child if she wanted to be adopted by her stepfather. Mother alleged that Father, his wife, and the parental grandparents took the minor child to the paternal grandparents' residence, that Father forcefully carried the minor child upstairs, that the paternal grandmother had to pry the child's fingers from the stair rail and in the process scratched the minor child.

When given the opportunity to dispute the substance of Mother's allegations, Father's attorney responded, "I know the substance of this is, I think, pretty accurate."

Trial courts have broad discretion to fashion parenting plans that best suit the unique circumstances of each case and appellate courts are reluctant to second-guess a trial court's determination regarding parenting schedules. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999); *see also Burton v. Burton*, No. E2007-02904-COA-R3-CV, 2009 WL 302301, at *1 (Tenn. Ct. App. Feb. 9, 2009). Decisions regarding parenting schedules often hinge on subtle factors, such as the parent's demeanor and credibility during the proceedings. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Thus, a trial court's decision regarding a permanent parenting plan will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

The trial court had a history with these parties and had the opportunity to observe them in court and evaluate their credibility, as well as that of various of their family members; the guardian ad litem expressed concern regarding the effect on the child of Father's and his parents' disregard of the court orders relative to how Father was to exercise his parenting time. Simply put, the trial court was uniquely situated to make the determination that suspending Father's parenting time was in the child's best interest. We have been cited to no evidence from which we could conclude that the court abused its discretion in suspending Father's parenting time.

## IV. CHILD SUPPORT

Father's initial child support obligation was set at $494.00 per month and sixty-six percent of the child's out-of-pocket medical expenses.[12] On May 2, 2011, he filed a motion styled "Motion to Determine Current Child Support and Arrears", in which he stated that an order setting support consistent with the guidelines had not been entered and requested that his child support amount be determined in accordance with the guidelines; a hearing on this motion, along with others, was held beginning August 3, 2011. In the order entered February 21, 2012, the court increased his support to $803.00 per month. Father contends that there no proof of the parties' income as listed on the child support worksheet in which his obligation was calculated, that the court did not find either party voluntarily unemployed or underemployed, and that the court failed to determine the parties' present ability to earn.

Tenn. Code Ann. § 36-5-101(e)(1)(A) instructs the trial court to apply the child support guidelines as a rebuttable presumption in determining the amount of child support. *See* Tenn. Comp. R. & Reg. § 1240-02-04-.01(1)(d)1. A child support award is to be

---

[12] The original order setting support is not in the record on appeal; however the original support amount is not in dispute.

determined based on an accurate determination of both parents' gross income. *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). A parent's gross income is generally equivalent to his earning capacity or ability to support. *Id.* However, certain situations may arise in which a court may "impute" income to a parent; this is "based on the premise that parents may not avoid their financial responsibility to their children by unreasonably failing to exercise their earning capacity." *Id.* Thus, "[i]ncome may also be imputed to a parent where the court has been provided no reliable evidence of the parent's income." *Id.*

At the hearing, Father testified at length regarding his finances. He testified that he was self-employed as a residential real estate appraiser and that his monthly income was $1,614.40, but that he was unable to determine his income from month to month, due in part to his business expenses. Father stated that he had probably lied to the court about his income in the past, and that his income was "probably higher" that what he had claimed. Father's tax records, bank account records and records from his self-employment as a residential real estate appraiser were introduced as exhibits.

The February 22 order incorporated a Child Support Worksheet, in which Father's monthly gross income was listed as $3,132.00; in the order the court stated the following relative to Father's testimony and evidence:

> This Court finds that Father presented perjured testimony to this Court specifically regarding Father's income, Father's Federal Income Tax returns, and Father's bank records, all of which were crucial in determining Father's ability to pay his child support related financial obligations, thereby constituting an obstruction of justice. Father bluntly stated twice to this Court "if I lied, I lied" in regards to his income and two (2) sets of Federal Income Tax returns presented to the Court as evidence by Father.

In his brief on appeal, Father does not cite to evidence contrary to the court's finding that Father presented perjured testimony or its finding as to his monthly income. It is apparent that the court did not determine that Father was underemployed, as Father argues, but, rather, that the court did not believe his testimony relative to his finances; the evidence presented by Father was not reliable. Under these circumstances and upon review of the record before us, the finding by the court recited above is fully supported; consequently, the court was permitted, consistent with Tenn. Comp. R. & Reg. § 1240-02-04-.04(3)(a)2(i)(II), to impute income to Father.[13]

---

[13] Tenn. Comp. R. & Reg. § 1240-02-04-.04(3)(a)2(i)(II) provides:

(continued...)

-16-

The record does not show, however, that the amount of child support was set in accordance with Tenn. Comp. R. & Reg. § 1240-02-04-.04(3)(a)2(iv)(II).[14] Specifically, the record before us does not show when the original order was entered or the amount of Father's income at the time of the original order. Accordingly, it is appropriate to vacate the order setting support at $803.00 per month and remand the case for the court to calculate the amount of income to be imputed and Father's support obligation in accordance with the regulation.

## V. ATTORNEYS' FEES

Father contends that the court erred in its calculation of Mother's attorneys' fees because a portion of the fees she incurred were attributable to the prosecution of the dependency and neglect petition upon which she did not prevail. Mother defends the award, contending that fees for the dependent and neglect proceeding were properly awarded under the authority of *Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289 (Tenn. Ct. App. Feb. 11. 2009).

_____

[13](...continued)
(3) Gross income.

    (a) Determination of Gross Income.
     * * *
       2. Imputed Income.
         (i) Imputing additional gross income to a parent is appropriate in the following situations:
         * * *
         (II) When there is no reliable evidence of income;

[14] Tenn. Comp. R. & Reg. § 1240-02-04-.04(3)(a)2(iv)(II) provides:

(iv) Imputing Income When There is No Reliable Evidence of Income.
* * *
   (II) When Modifying an Existing Order

     I. If a parent fails to produce reliable evidence of income (such as tax returns for prior years, check stubs, or other information for determining current ability to support); and
     II. The tribunal has no reliable evidence of that parent's income or income potential;
     III. After increasing the gross income of the parent failing or refusing to produce evidence of income by an increment not to exceed ten percent (10%) per year for each year since the support order was entered or last modified, the tribunal shall calculate the basic child support obligation using the increased income amount as that parent's gross income.

-17-

Tenn. Code Ann. § 36-5-103(c)[15] gives a court discretion to award attorney fees incurred in proceedings involving the custody and support of children. Such awards, however, are to a party who has prevailed in an effort to secure or protect a custody arrangement or award of support.[16] Under the circumstances presented, it is not clear that the court's award in this case excluded time spent by Mother in her prosecution of the dependent and neglect petition. It is, consequently, appropriate to remand the case for the trial court to delineate the services for which the award was made and, as necessary, exclude those devoted to the dependent and neglect proceeding.

## CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court holding Father in criminal contempt of court, in setting Father's child support obligation at $803.00 per month, and in awarding Mother attorney fees of $18,106.23 is vacated and the case remanded for further proceedings in accordance with this opinion; in all other respects, the judgment is affirmed.

_____
RICHARD H. DINKINS, JUDGE

---

[15] Tenn. Code Ann. § 36-5-103(c) provides:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

[16] We do not agree with Mother's reading of *Green*. In that case Father was awarded fees for his successful prosecution of a dependency and neglect proceeding in Juvenile Court; the dependency and neglect finding was reversed on appeal to the circuit court on the grounds that the conditions which led to the Juvenile Court finding were no longer present. This court reversed the Circuit Court order dismissing the Juvenile Court petition and affirmed the award of fees, holding that there was "no question that at one point Mother participated in a situation that caused her children to be dependent and neglected which justified placement of the children in Father's care." *Green*, 2009 WL 348289 at *11. In this case, there has been no finding that Faith was dependent and neglected.